# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION, CANTON

| | |
|---|---|
| In re: | ) |
| | ) Case No. 10-64360 |
| TWIN CITY HOSPITAL, | ) |
| | ) Chapter 11 |
| Debtor. | ) |
| | ) Judge Russ Kendig |
| | ) |
| | ) |
| | ) |

## AFFIDAVIT AND STATEMENT OF DOUGLAS J. ROSS, SR. IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF OHIO | ) |
| | ) SS: |
| COUNTY OF TUSCARAWAS | ) |

I, Douglas J. Ross, Sr. under penalty of perjury, hereby declare as follows:

I am the Chairperson of the Board of Trustees (the "Board") of Twin City Hospital (the "Debtor" or "Twin City") and have held such position since January 1, 2010. I am familiar with the business, operating history and affairs of Twin City. Twin City is the chapter 11 debtor and debtor in possession in the above-captioned chapter 11 case.

I submit this affidavit (the "Affidavit") in support of the Debtor's petition for relief under chapter 11 of title 11 of the United States Code §§ 101-1532 (the "Bankruptcy Code"), filed concurrently herewith, and other relief, in the form of motions and applications, that the Debtor has requested of this Court (the "First Day Motions and Applications"). I believe that the relief sought in each of the First Day Motions and Applications: (a) is necessary to enable the Debtor to operate in chapter 11 with minimum disruption to its operation; (b) is necessary to protect the Debtor's estate from loss of value; (c) constitutes a critical element in achieving a successful

{2343020:}

reorganization of the Debtor; and (d) best serves the Debtor's estate, patients and its creditors' interests.

All of the facts set forth in this Affidavit and Statement are based on my personal knowledge, upon information supplied to me by others at the Debtor's business, upon my review of relevant documents, and/or my opinion based upon my experience and knowledge of the Debtor's operation and financial condition. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

This Affidavit describes the business of the Debtor and the circumstances surrounding the commencement of the Debtor's chapter 11 case.

## I.    Background

### A.    The Chapter 11 Filing

1.      On October 13, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and is operating and managing its business, as a debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### B.    Corporate Information

2.      Founded in 1912, the Debtor is an independent, not-for-profit entity, organized exclusively for charitable, scientific and educational purposes, and holds tax exempt status in accordance with Section 501(c)(3) of the Internal Revenue Code. The Debtor has no sponsor or parent organization, and is governed by a Board of Trustees (the "Board") consisting of thirteen total members nominated as follows: (i) twelve members, including the Chief Executive Officer, elected by the Board; and (ii) one member nominated by the Twin City Hospital Medical Staff.

10-64360-rk    Doc 2    FILED 10/13/10    ENTERED 10/13/10 23:19:07    Page 2 of 10

## C.    General Operations and History

3.    The Debtor is a 25-bed critical access hospital ("CAH") located in the Village of Dennison, Tuscarawas County, Ohio ("Dennison"), a community approximately 100 miles east of Columbus, Ohio.  The Debtor provides a broad spectrum of acute care services including, but not limited to: (i) surgery and recovery; (ii) cardiopulmonary services; (iii) radiological imaging; (iv) sports injury and rehabilitation; (v) pharmacological services; and (vi) diabetic wellness. The Debtor has been the primary acute care center for Dennison since its founding in 1912.  On January 11, 2001, the Debtor was approved by the United States Department of Health and Human Services, pursuant to the requirements set forth at 42 Code of Federal Regulations, Part 485, for participation in the Medicare Program as a CAH.

4.    In addition to the CAH located at 819 North First Street, Dennison, Ohio, the Debtor owns property located at 17 Fuhr Street, Dennison, Ohio and 808 N. First Street, Dennison, Ohio.  Both properties are utilized by the Debtor for storage.

5.    The Debtor's primary service area consists of Dennison and its surrounding communities.  The Debtor's patient mix consists of individuals covered by Medicare and Medicaid, individuals with third-party insurance coverage, and individuals who self-pay. Specifically, in year ended December 31, 2009, the Debtor's patient mix, based on revenue, was as follows:  33% Medicare, 12% Medicaid, 39% third-party insurance coverage, and 16% self-pay patients.

6.    Most recently, the Debtor completed construction on a new 27,000 square foot Medical Center to provide superior medical services to the community.  The Medical Center includes a new emergency services department, in addition to cardiopulmonary, imaging, laboratory and surgery departments.  Housing nearly all patient care functions, the Medical

Center was designed to capture the most current medical and patient care technologies, while, at the same time, providing efficiency and convenience to the community.

**D.**     **Prepetition Debt Structure**

*(1)*     *The Hospital Facilities Revenue Bonds, Series 2007*

7.     On September 1, 2007, the County of Tuscarawas issued the Hospital Facilities Revenue Bonds, Series 2007, in the aggregate amount of $16,775,000 (the "Series 2007 Bonds"). In connection with the Series 2007 Bonds and that certain Indenture of Trust between U.S. Bank National Association and the County of Tuscarawas, Ohio (the "Trust Indenture"), the proceeds of the Series 2007 Bonds were loaned to the Debtor, with such loan documented by certain prepetition financing agreements executed by the Debtor, including the Master Trust Indenture, the Supplemental Master Trust Indenture Number One and Mortgage and Security Agreement, the Twin City Hospital Series 2007 Note (the "Series 2007 Note"), and the Twin City Hospital Subordinated Series 2007 Note (the "Subordinated Series 2007 Note"), together with all amendments thereto and extensions thereof and all security agreements and instruments related thereto (collectively, the "Prepetition Financing Agreements"). The purpose of the Series 2007 Bonds was to finance the construction and installation of expanded hospital facilities.

8.     Under the terms of the Prepetition Financing Agreements, specifically the Series 2007 Note, the Debtor is required to make payments sufficient to pay the principal and interest on the Series 2007 Bonds as they become due. The Series 2007 Bonds are subject to specific redemption provisions and include serial bonds[1], bearing interest ranging from 6.10% to 6.35%, and maturing from November 1, 2022 to November 1, 2037.

---

[1]  Serial bonds are bond issues in which a portion of the outstanding bonds mature at regular intervals until the entirety of the bonds have matured on a previously established date.

9.     The Subordinated Series 2007 Note provided the Debtor with a $1.0 million line of credit established by Fifth Third Bank ("Fifth Third") for the benefit of the Debtor to assist the Debtor in financing certain working capital needs related to the hospital facilities.[2]  Payment of principal and/or accrued interest on the Subordinated Series 2007 Note was prohibited until such time as the full payment of those amounts then due and owing on the Series 2007 Note had been made or provided for pursuant to the terms of the Series 2007 Note.

10.     The Debtor's obligations under the Prepetition Financing Agreements are secured by the Debtor's gross receipts, in addition to a deed of trust between the Debtor and the individual trustees which creates a lien on, and a security interest in, the hospital facilities, including improvements and equipment, both present and after acquired, and the land upon which the hospital facilities are located.

11.     In addition to the aforementioned obligations, the Debtor is required to maintain certain deposits with Wells Fargo Bank, National Association[3] (the "Master Trustee"). Furthermore, the Debtor is limited on the amount of additional indebtedness that it may incur, and must satisfy certain measures of financial performance, while the Series 2007 Bonds remain outstanding.  To date, approximately $16,512,813.52 in gross aggregate principal amount of the Series 2007 Bonds remains outstanding under the Bond Indenture.

*(2)     The Commercial & Saving Line of Credit*

12.     In addition to the Series 2007 Bonds, the Debtor executed that certain Promissory Note and Commercial Security Agreement between the Debtor and The Commercial & Savings Bank ("Commercial Savings") which established a line of credit for the benefit of the Debtor in

---

[2]  The Subordinated Series 2007 Note was utilized during construction and expansion of the hospital facilities.  The Debtor can no longer draw on the line of credit, nor are there any amounts due and owing from the Debtor to Fifth Third on the Subordinated Series 2007 Note.

[3]  Wells Fargo Bank, National Association is the successor Master Trustee to U.S. Bank National Association.

10-64360-rk     Doc 2     FILED 10/13/10     ENTERED 10/13/10 23:19:07     Page 5 of 10

the maximum of $250,000 (the "Commercial LOC"). Much like the Subordinated Series 2007 Note at the time of its utilization by the Debtor, the purpose of the Commercial LOC is to assist the Debtor in financing certain working capital needs related to the hospital facilities.

13.     In conjunction with the Commercial LOC, Commercial Savings filed a UCC Financing Statement, designated document no. 200935034440, with the Ohio Secretary of State. Pursuant to the UCC Financing Statement, Commercial Savings possesses an interest in all current and after acquired accounts of the Debtor. To date, the outstanding balance on the Commercial LOC is $250,000.

**E.     Events Leading to Chapter 11**

14.     In the spring of 2005, the Debtor initiated the process of planning, designing and funding a new facility to house emergency, surgical and ambulatory services (the "Expansion Plan"). The Expansion Plan was thereafter revised to include the addition of a second story nursing unit. The Expansion Plan was intended to modernize the Debtor's facilities and provide patients with superior medical services. When complete, the Expansion Plan would increase the Debtor's existing facilities by 27,000 square feet. By June of 2005, a fundraising campaign to raise funds for the Expansion Plan received approximately $2.8 million in pledges.

15.     In August of 2006, the Board approved a resolution to enter into a bond transaction to fund the Expansion Plan. The amount of the bond transaction was approved at $16,775,000. While the Debtor reviewed financing proposals, of which three were received, ground was broken on the Expansion Plan and initial construction began.

16.     The Board approved of the use of the Series 2007 Bonds to fund the Expansion Plan in August of 2007, with financing complete in September of 2007. With funding complete, construction continued on the Expansion Plan for approximately 19 months and, in March of 2009, the new Medical Center was opened and began to accept patients.

17.     Although it was anticipated that the Expansion Plan and eventual construction of the Medical Center would provide a means in which to provide significantly improved services to patients, and, as a result, increased revenues, the Debtor experienced an operating loss beginning at fiscal year end 2006. This operating loss, determined to be $407,000, was a result of several factors, including, but not limited to, a 7% decline in patient admissions and 24% decline in patient days.

18.     The Debtor continued to experience operating losses in subsequent years. Specifically, in 2007, the Debtor's operating loss was $795,000; in 2008, $895,000; and, in 2009, $2,146,000. Although the Debtor continued to provide critical services to the community, patient admissions and, as a result, patient receivables, continued to fall. Additionally, the Debtor experienced an unexpected increase in bad debt expense.

19.     Beginning in January of 2010, certain suppliers and vendors of the Debtor began to voice concern with respect to payment on open invoices. In response, the Debtor discussed with vendors the probability that funds received from the 2009 Medicare/Medicaid Cost Report (the "Cost Report") would suffice in covering outstanding invoicing. Unfortunately, when the Cost Report was completed, the settlement received by the Debtor totaled $184,000; significantly less than the amount required to fulfill the Debtor's outstanding vendor obligations.

20.     Faced with mounting losses, the Board, in May of 2010, engaged American Healthcare Solutions ("AHS") to provide interim management services and discharged then Chief Executive Officer, Marge Jentes. AHS immediately reviewed the Debtor's books and records through April of 2010. The financial statements reflected that the Debtor's accounts payable grew from approximately $2.6 million at the end of September, 2009, to approximately $5.2 million at the end of June, 2010.

21.     While the Debtor and AHS considered the impact of the financial statements, the Canton Aultman Emergency Physicians ("CAEP") informed the Debtor that, due to non-payment of invoices, CAEP would be withdrawing their services effective July 10, 2010.  As a result, the Debtor's emergency department was to be closed on July 9, 2010.  Through the Board's intervention, in addition to the involvement of community members and local foundations, the Debtor was able to resolve its outstanding issues with CAEP, therefore allowing the Debtor's emergency department to remain open.

22.     For a variety of reasons, the Debtor discharged AHS on July 16, 2010 and, immediately thereafter, engaged the services of Quorum Health Resources ("QHR") to serve as interim management to the Debtor.  Following its engagement, QHR began assisting with the Debtor's operations and, as a result, the Debtor has begun implementation of several initiatives in an effort to reconfigure the business and return to profitability.  These initiatives include, but are not limited to: (i) reviewing, where appropriate, services provided by physicians and nurses; (ii) improving various supplier and vendor relationships to maximize efficiency; and (iii) restructuring and reassigning costs to more accurately assess the efficiencies within the system. Furthermore, one of the immediate goals of QHR was to research and secure, if possible, a bridge loan for the Debtor to assist in addressing and resolving the Debtor's financial distress. Although QHR met with and discussed the Debtor's financial situation with parties able to provide financial support, QHR was unable to secure a commitment to provide financing.  Faced with no other option, QHR, with the approval of the Debtor, approached the Master Trustee for emergency financial assistance.  Unfortunately, no agreement on terms could be reached.

23.     In light of its present financial condition, the Debtor, as referenced above, is unable to meet its outstanding obligations to its suppliers and vendors.  Furthermore, the Debtor has not been able to meet its long-term debt obligations on the Series 2007 Note and the

Subordinated Series 2007 Note. The last payment remitted by the Debtor to the Master Trustee on the Series 2007 Note was in the amount of $109,275.06 and received by the Master Trustee on or about July 22, 2010.

24.     The implementation of cost-savings initiatives are still in their infancy, and, accordingly, have not had an opportunity to significantly impact the cash position of the Debtor to the positive. Coupling such initiatives with the experienced and expected increases in fixed-payor revenues, such as Medicare and Medicaid, and the experienced and expected increases in self-payor patient revenues, the cash reserves of the Debtor are ultimately not sufficient to continue operation for any significant period of time outside the protections of a chapter 11 bankruptcy.

**F.     Support of First Day Motions**

25.     Concurrently with the filing of this chapter 11 case, the Debtor has filed a number of First Day Motions and Applications. I have reviewed each of these First Day Motions and Applications (including the Exhibits attached thereto) and I believe that the relief sought in each of these First Day Motions and Applications is necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption or loss of revenue.

## II.     Notice

26.     No trustee, examiner or official committee has been appointed in this chapter 11 case. This Affidavit has been served on the following parties or, in lieu thereof, to their counsel, if known: (i) the Office of the United States Trustee for the Northern District of Ohio; (ii) those creditors listed on the Debtor's List of Creditors Holding the 20 Largest Unsecured Claims; (iii) Wells Fargo Bank, National Association; (iv) The Commercial & Savings Bank; and (v) the District Director of Internal Revenue. The Debtor submits that no other or further notice need be given.

### III.  Conclusion

27.    For the forgoing reasons, I respectfully submit that the relief sought in the First Day Motions and Applications is necessary and appropriate, and request that the Court grant the requested relief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

October 13, 2010

_____
Douglas J. Ross, Sr.
**Chairman of the Board of Trustees, Twin City Hospital**

{2343020:}