**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION, CANTON**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-64360 |
| TWIN CITY HOSPITAL, ) | |
| ) | Chapter 11 |
| Debtor. ) | |
| ) | Judge Russ Kendig |
| ) | |
| ) | |

**DEBTOR'S MOTION FOR ORDER (I) AUTHORIZING THE DEBTOR TO
(A) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (B) PROVIDE
ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361 AND 363 AND
(II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

The above-captioned debtor and debtor in possession (the "Debtor"), pursuant to sections 105, 361 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), requests entry of an order (i) authorizing the Debtor to (a) use cash collateral pursuant to 11 U.S.C. § 363(a), and (b) provide adequate protection pursuant to 11 U.S.C. § 361 and § 363; and (ii) scheduling a final hearing pursuant to Bankruptcy Rule 4001.

In support of this Motion, the Debtor respectfully represents as follows:

### I. Background

**A.    The Debtor's Case**

1.    On October 13, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is continuing in possession of its property and is operating and managing its business, as debtor in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

{2338835:3}

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and § 157. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The venue of Debtor's chapter 11 case and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. Detailed facts regarding the Debtor and reasons for the commencement of this chapter 11 case are set forth in the Affidavit and Statement of Douglas J. Ross, Sr., Chairman of the Board of Trustees, in Support of Chapter 11 Petition and First Day Motions (the "Ross Affidavit"), filed concurrently herewith.

**B.      Summary of Prepetition Financing Agreements**

4. As more fully described in the Ross Affidavit, in 2002, the Debtor raised $16,775,000 through the issuance of Hospital Facilities Revenue Bonds (the "Series 2007 Bonds"). In connection with the issuance of the Series 2007 Bonds, and a certain Indenture of Trust between U.S. Bank National and the County of Tuscarawas, Ohio (the "Trust Indenture"), the Debtor entered into various prepetition financing agreements, including the Master Trust Indenture, the Supplemental Master Trust Indenture Number One and Mortgage and Security Agreement, the Twin City Hospital Series 2007 Note (the "Series 2007 Note," payable to U.S. Bank National, hereinafter the "Master Trustee"[1]), the Twin City Subordinated Series 2007 Note (the "Subordinated Series 2007 Note," payable to Fifth Third Bank, hereinafter "Fifth Third"), the Agreement of Lease, the Sublease, the Tax Exemption Certificate and Agreement, and the Continuing Disclosure Agreement, together with all amendments thereto and extensions thereof and all security agreements and instruments related thereto (collectively, the "Prepetition Financing Agreements"). The purpose of the Series 2007 Bonds was to finance the construction and installation of expanded hospital facilities. As of the Petition Date, approximately

---
[1] Wells Fargo Bank, National Association, is the successor Master Trustee to U.S. Bank National.

$16,512,813.52 in gross aggregate principal of the Series 2007 Bonds remains outstanding under the Bond Indentures.

5. In addition, the Debtor entered into a line of credit agreement, more fully described below, with The Commercial & Savings Bank ("Commercial Savings") to finance certain working capital needs related to the hospital facilities. The Master Trustee and Commercial Savings are sometimes hereinafter referred to as the "Prepetition Secured Lenders."

### *(1) Series 2007 Note*

6. On or about September 20, 2007, the Debtor executed the Series 2007 Note in favor of the Master Trustee in the original amount of $16,775,000. The purpose of the Series 2007 Note is to evidence the obligations of the Debtor under the Sublease entered into by the Debtor and the County of Tuscarawas, Ohio (the "County") in connection with the issuance and sale of the Series 2007 Bonds. Pursuant to the terms of the structure of the financing, the Debtor conveyed a leasehold interest in the hospital and the real estate it occupies to the County. Thereafter, under the Sublease, the County subleased to the Debtor all real property and such buildings and improvements thereupon that encompass the hospital facilities.

7. Under the terms of the Series 2007 Note, the Debtor is required to make payments sufficient to pay the principal and interest on the Series 2007 Bonds as they become due. The Series 2007 Bonds are subject to specific redemption provisions and include serial bonds[2], bearing interest ranging from 6.10% to 6.35%, and maturing from November 1, 2022, to November 1, 2037.

8. Pursuant to the Prepetition Financing Agreements, the Series 2007 Note is secured by a first priority lien and security interest in all assets and property of the Debtor,

---

[2] Serial bonds are bond issues in which a portion of the outstanding bonds mature at regular intervals until the entirety of the bonds have matured on a previously established date.

including, but not limited to, gross receipts, accounts receivable and certain real property and improvements thereupon (the "Prepetition Collateral").

### *(2)* *Subordinated Series 2007 Note*

9. Concurrently with the Series 2007 Note, the Debtor executed the Subordinated Series 2007 Note between the Debtor and Fifth Third. The Subordinated Series 2007 Note reflected a line of credit established by Fifth Third for the benefit of the Debtor in the maximum amount of $1.0 million.[3]

10. The Subordinated Series 2007 Note was fully subordinated to the Series 2007 Note. Payment of principal and/or accrued interest on the Subordinated Series 2007 Note was prohibited until such time as the full payment of those amounts then due and owing on the Series 2007 Note had been made or provided for pursuant to the terms of the Series 2007 Note.

### *(3)* *The Commercial & Savings Bank Line of Credit*

11. On or about December 14, 2009, the Debtor executed that certain Promissory Note and Commercial Security Agreement between the Debtor and Commercial Savings (the "Commercial LOC," together with the Series 2007 Note and Subordinated Series 2007 Note, the "Prepetition Secured Debt") permitting the Debtor to draw, at maximum, $250,000 on the Commercial LOC.

12. In conjunction with execution of the Commercial LOC, Commercial Savings filed a UCC Financing Statement, designated document no. 200935034440, with the Ohio Secretary of State. Pursuant to the UCC Financing Statement, Commercial Savings' extension of credit to the Debtor is secured by current and after acquired accounts of the Debtor.

---

[3] The Subordinated Series 2007 Note was utilized by the Debtor during the construction and installation of the expanded hospital facilities to provide assistance with respect to certain working capital needs at that time. The Debtor cannot draw on the line of credit established by the Subordinated Series 2007 Note, nor are there any amounts due and owing from the Debtor to Fifth Third on the Subordinated Series 2007 Note.

13. As of the Petition Date, the Debtor was and continues to be, under the Prepetition Financing Agreements and the Commercial LOC, indebted and liable to the Master Trustee in the aggregate amount of $16,512,813.52 on the Series 2007 Bonds and in the amount of $250,000 on the Commercial LOC.

14. It is the Debtor's understanding and belief that the Master Trustee's first priority lien and security interest in all assets and property of the Debtor is superior to any interests held by Commercial Savings.

C. **Summary of Relief Sought**

15. By this Motion, the Debtor seeks entry of an interim order (i) authorizing the Debtor to (a) use cash collateral and (b) provide the Prepetition Secured Lenders with adequate protection; and (ii) scheduling a final hearing. The use of cash collateral, including those funds currently held by the Master Trustee in the Debt Service Reserve Account (the "Reserve Account"), is necessary to permit the Debtor to operate its business, to continue to provide patient care and to develop a plan of reorganization. Absent use of cash collateral, the Debtor would be forced to shutter its operations, the result of which would be devastating in that it would cause immediate termination of patient care, a substantial loss in the value of the Debtor's business, and irreparable harm to the Debtor, its estates, its patients, and its creditors.

16. The Debtor is in the business of providing critical health care services to the citizens of the Tuscarawas County, specifically those located in the Village of Dennison ("Dennison") and its surrounding communities. The Debtor's operations cannot be shut down in an efficient manner without jeopardizing the health, safety and welfare of those patients currently under the care of the Debtor's professionals, in addition to those prospective patients that would present to the Debtor's professionals in the foreseeable future. A sudden cessation of operations

would be detrimental for the Debtor's patients and detrimental to the communities in which the Debtor operates.

17. Accordingly, the Debtor requests authority to use cash collateral, including the funds held in the Reserve Account, in accordance with the Budget (defined below), which the Debtor submits reflects the reasonable, necessary costs and expenses of preserving its assets and paying certain necessary expenses associated with its chapter 11 case.

## II. Relief Requested

18. Pursuant to sections 363(a) and 552(b) of the Bankruptcy Code, certain cash and cash equivalents held by the Debtor as of the commencement of its chapter 11 case and the proceeds of the Prepetition Collateral received by the Debtor after the commencement of its case constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code. Pursuant to the terms of the agreements that secure the Prepetition Secured Debt, the Prepetition Secured Lenders have an interest in such cash collateral of the Debtor ("Cash Collateral").

19. By this Motion, the Debtor respectfully requests the following relief:

   a. that the Court conduct a preliminary hearing to consider this Motion (the "Interim Hearing") pursuant to Bankruptcy Rule 4001;

   b. that, after the Interim Hearing, the Court enter an interim order substantially in the form of the order attached hereto as Exhibit A (the "Interim Cash Collateral Order") authorizing the Debtor, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b), to use Cash Collateral to fund the expenses set forth in the 13-week budget (the "Budget," a copy of which is attached hereto as Exhibit B) upon the terms and conditions set forth in the attached Interim Cash Collateral Order, pending a final hearing on this Motion;

c. that the Court grant to the Prepetition Secured Lenders as adequate protection, pursuant to sections 361 and 363(c)(2)(B) of the Bankruptcy Code, for the use of Cash Collateral and other diminution in value (if any) of the Prepetition Collateral, the following: (i) replacement liens on the Debtor's postpetition collateral, including new accounts receivable generated postpetition; (ii) a lien on the postpetition proceeds received by the Debtor through the Hospital Care Assurance Program[4]; (iii) a lien on the postpetition tax revenues received by the Debtor[5]; and (iv) regular reporting[6]; and

d. that the Court schedule a final hearing (the "Final Hearing") to approve the relief requested herein on a final basis and, in the absence of a timely filed and served objection, deem the Interim Cash Collateral Order a final order without further action by the Court.

---

[4] The Hospital Care Assurance Program ("HCAP") provides financial assistance to hospitals for the care provided to the indigent and underinsured. For example, the Debtor recognized $120,064 and $118,421 in net HCAP financial assistance for the years ended December 31, 2009 and December 31, 2008, respectively.

[5] On May 2, 2006, the citizens of Dennison and Ulrichsville, Ohio, approved a property tax levy to support the Debtor. Funding received as a result of the levy is to be used to supplement the general operations of the Debtor (the "Tax Revenues"). For example, the Debtor received revenues of approximately $134,000 and $229,000 for the years ended December 31, 2009 and December 31, 2008, respectively.

[6] The Debtor's regular reporting to the Prepetition Secured Lenders would consist of weekly marketing reports, weekly budget reports, weekly cash flow projections, and bi-monthly conference calls with the Prepetition Secured Lenders and/or their representatives. Further, the Debtor would grant the Prepetition Secured Lenders' financial advisors with reasonable access to information and documentation related to the Debtor's financial condition and business operations

### III. Basis for Relief

20. The use of Cash Collateral is necessary for the Debtor to maintain sufficient liquidity so that it may continue to operate during the pendency of this chapter 11 case. Without immediate access to Cash Collateral, the Debtor will not be able to pay the ongoing costs of running its business and administering its estate, the result of which would be the cessation of operations, an inability to provide patient care, irreparable damage to the value of the Debtor and the corresponding diminution in the value of the Prepetition Collateral. Indeed, the Debtor has determined that, if it is not allowed the use of Cash Collateral, it cannot maintain its operations, and this chapter 11 case likely would be converted to a case under chapter 7 of the Bankruptcy Code in relatively short order. More importantly, in the context of a healthcare facility, the inability to use cash could lead to substantial harm to patients.

21. Moreover, access to Cash Collateral will provide the Debtor's patients, vendors, and employees with the comfort that the Debtor will be able to continue to conduct business in the ordinary course and without interruption. Otherwise, the Debtor would likely face a dramatic dropoff in patient admissions, a loss of critical employees and physicians and a loss of vital vendor support. The result would be a forced shut-down of the Debtor's operations, severely and irreparably harming not only the Debtor's estate and creditors, but also resulting in the shut down of a "Critical Access Hospital," jeopardizing access to critical emergency and medical care to tens of thousands of people located in the County, Dennison, and its surrounding communities.[7]

---

[7] The Debtor believes that owing to licensing restrictions for Critical Access Hospitals, if it were to close, even for a short period, it could not re-open as a Critical Access Hospital.

A.   **The Statutory Basis for Adequate Protection**

22.   The Debtor's use of Cash Collateral, including the Debtor's proposed provision of adequate protection set forth below, is authorized pursuant to section 363(c) of the Bankruptcy Code. The Court, in authorizing the use of cash collateral, may do so if it finds that the interest of the entity holding a lien on cash collateral is, or will be, adequately protected. In this case, the Prepetition Collateral will be adequately protected by the imposition of replacement liens in new accounts receivable generated by the Debtor's postpetition operations, in addition to the proceeds received by the Debtor pursuant to the Hospital Care Assurance Program and certain tax revenues.

B.   **The Prepetition Lenders Are Adequately Protected and Use of Cash Collateral Is Proper**

23.   Section 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b) authorize the Court to enter an order authorizing the Debtor to use cash on an interim basis. As set forth herein, and as will be demonstrated at the Interim Hearing, the interests of the Prepetition Secured Lenders in Cash Collateral will be adequately protected through the continued operation of the Debtor and the liens and other rights proposed.

24.   Section 363(c)(2) of the Bankruptcy Code provides that a debtor "may not use, sell or lease cash collateral…unless (A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section." See 11 U.S.C. §363(c). The Debtor has asked the Prepetition Secured Lenders to consent to the use of Cash Collateral, subject to an agreeable form of interim order. Although the parties continue to discuss the consensual use of Cash Collateral, no agreement has been reached as of the date of filing of this Motion. Should the Debtor's Prepetition Secured Lenders withhold consent, or otherwise object to the relief sought

herein, the Debtor submits it has adequate grounds to utilize Cash Collateral on a nonconsensual basis.

25. Section 363(e) provides that, on request of an entity that has an interest in cash collateral to be used, the court may condition such use as is necessary to provide adequate protection of such interest. What constitutes adequate protection must be decided on a case-by-case basis. See Mbank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); see also, S. Rep. No. 95-989, 95th Cong., 2d Sess. 54 (1978). The focus of the requirement is to protect a secured creditor from diminution in the value of its collateral during the use period. See In re Gasel Transp. Lines, Inc., 326 B.R. 683, 692 (6th Cir. B.A.P. 2005); Matter of Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); Delbridge v. Production Credit Association and Federal Land Bank (In re Delbridge), 104 B.R. 824 (E.D. Mich. 1989).

26. The test for determining what constitutes adequate protection is "whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral." In re Carbone Companies, Inc., 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) citing Gasel Transp. Lines, 326 B.R. 683. In other words, if a debtor's proposed protections adequately preserve the creditor's interest in the collateral as it existed on the petition date, then that creditor is adequately protected.

27. The Debtor has a clear emergency need for the immediate use of Cash Collateral to, among other things, maintain ongoing day-to-day hospital operations and fund its working capital needs. The Debtor requests that the Court approve its use of Cash Collateral to pay wages, salaries, operating expenses and certain professional fees incurred during this case, each of which is reflected in the Budget.

28. Permitting the Debtor to utilize Cash Collateral will have the dual effect of protecting the Prepetition Secured Lenders' collateral as well as providing the Debtor with the funds necessary to begin the administration of its chapter 11 case. The law fully contemplates a flexible position in evaluating the Debtor's ability to provide adequate protection. In this instance, the Prepetition Collateral will be protected by replacement liens, in addition to the Debtor's turnover of certain funds, as more fully described below. Furthermore, the Debtor anticipates that it will continue to receive cash from operations sufficient to maintain the going concern value of its business and, therefore, sufficient to protect the value of the Prepetition Collateral.

C.  **Courts Consistently Hold that "Adequate Protection" Can Take Various Forms**

29. Adequate protection is typically established by demonstrating that cash is being used to maintain and enhance the value of the underlying income producing property in which the creditor also usually holds a security interest. Other factors are also considered, such as whether or not there is equity in the property, whether the property is declining in value, and whether or not postpetition payments due the creditor are current. See In re The Atrium Development Company, 159 B.R. 464, 471 (Bankr. E.D. Va. 1993).

30. Section 361 of the Bankruptcy Code provides that periodic cash payments, replacement liens, or relief constituting the "indubitable equivalent" of the creditor's interest may provide adequate protection. See In re Potvin Lumber Company, Inc., 24 B.R. 54 (Bankr. D. Vt. 1982) (ordering that the debtors could use cash collateral, and finding that the bank was adequately protected where the total value of the Debtor's personal property exceeded the bank's indebtedness); see also, In re Coventry Commons Associates, 149 B.R. 109 (Bankr. E.D. Mich. 1992); In re The Resolution Trust Corporation v. Swedeland Development Group, Inc. (In re

{2338835:3}                                                             11

10-64360-rk    Doc 8    FILED 10/14/10    ENTERED 10/14/10 00:42:06    Page 11 of 16

Swedeland Development Group, Inc.), 16 F.3d 552, 564 (3d Cir. 1994). The Debtor proposes to provide the Prepetition Secured Lenders with adequate protection as set forth below.

**D.     Granting Replacement Liens Constitutes Adequate Protection**

31.     Adequate protection can be provided through a "replacement lien," or a lien on postpetition assets to compensate for the use of prepetition collateral. See In re Dynaco Corporation, 162 B.R. 389, 394 (Bankr. D. N.H. 1993). Courts have consistently held that the granting of replacement liens in such collateral is sufficient adequate protection. For example, the bankruptcy court in O'Connor authorized the debtor to use $721,000 of cash collateral to drill three new gas wells that were expected to produce revenues with a present value of $3,674,000. Finding that the secured creditor was adequately protected by the debtor's excellent prospects of success and the potential value of the new revenues, despite the inherent risk of drilling dry holes, the court held that "[i]n order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard." Mbank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d at 1398; see also, In re Quality Interiors, Inc., 127 B.R. 391 (Bankr. N.D. Ohio 1991) (the court held that the granting of a replacement lien in the amount $10,001.49 provided adequate protection for the debtor in possession's bank as contemplated by § 363(e)); In re 495 Central Park Avenue Corp., 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (projected property improvements constituted adequate protection when rental income from lease conditioned on improvements would increase value of real estate by at least $800,000).

32.     Here, the Debtor proposes to grant the Prepetition Secured Lenders replacement liens in certain postpetition assets of the Debtor, including new accounts receivable generated postpetition. This will result in a "replacement" of prepetition collateral (the cash resulting from collection and consumption of prepetition gross receipts and accounts) with new, postpetition

collateral (the cash resulting from the collection of postpetition gross receipts and accounts). The Debtor believes that during the initial phases of this chapter 11 case, the Debtor's total cash use will, at best, decline minimally and, at worst, remain static. As a result, the Prepetition Secured Lenders will experience little or no diminution in the value of their total collateral pool.

33. The Debtor also proposes to grant the Prepetition Secured Lenders a lien in those HCAP and Tax Revenue proceeds received by the Debtor postpetition. In the recent past, these amounts have been significant. Although it is impossible to predict what the aggregate, postpetition total of the HCAP and Tax Revenue proceeds will be, the Debtor believes that the total will be considerable and provide the Prepetition Secured Lenders with added protection exclusive of the replacement liens.

34. The Debtor proposes that all security interests and liens granted to the Prepetition Secured Lenders in any postpetition collateral under the terms of the Interim Cash Collateral Order shall have the same priority as the liens held by the Prepetition Secured Lenders prior to the Petition Date, including amongst the Prepetition Secured Lenders. Such liens shall be senior to the right of all other entities, including without limitation, the Debtor and any successor trustee in this or any subsequent case under the Bankruptcy Code, but subject to the allowed postpetition fees and expenses of professionals retained in the Debtor's case and the fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930.

35. In summary, the proposed Interim Cash Collateral Order, if approved, will provide the Debtor with the ability to use Cash Collateral while providing the Prepetition Secured Lenders with adequate protection, as contemplated by sections 363(c)(2)(B) and 363(e) of the Bankruptcy Code, in the same order of priority as held by the Prepetition Secured Lenders prior to the Petition Date.

{2338835:3}     13

10-64360-rk    Doc 8    FILED 10/14/10    ENTERED 10/14/10 00:42:06    Page 13 of 16

### E. Interim Approval Should Be Granted

36. The Debtor submits that the relief requested by this Motion is necessary, essential and appropriate and is in the best interests of, and will benefit, the Debtor, its estate, its patients, and its creditors. Specifically, granting the limited relief set forth in the Interim Cash Collateral Order pending the Final Hearing on this Motion will provide the Debtor with the necessary liquidity to: (a) minimize disruption to the Debtor's business and on-going operations; (b) preserve and maximize the value of the Debtor's estate for the benefit of all creditors; and (c) avoid immediate and irreparable harm to the Debtor, its patients, its creditors, its business, its employees and its assets. Thus, the use of Cash Collateral is necessary to avoid immediate and irreparable damage to the Debtor's estate, and the Debtor submits that interim relief pursuant to Bankruptcy Rule 4001 is appropriate.

37. Bankruptcy Rule 4001(b) provides that if, as here, a debtor seeks to use cash collateral during the 14-day period following the filing of a motion requesting authorization to use such cash collateral, the court may authorize the use of "only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending Final Hearing." Fed. R. Bankr. P. 4001(b)(2).

38. Without immediate access to the Cash Collateral, the Debtor expects to suffer an acute cash shortage immediately, which shortage would threaten its ability to maintain operations in the short term – even through the date of any final hearing. Accordingly, the Debtor requests that the Court schedule and conduct an interim hearing to consider entry of the proposed Interim Cash Collateral Order authorizing the Debtor to utilize Cash Collateral as provided in the proposed Interim Cash Collateral Order, and granting adequate protection as provided in the proposed Interim Cash Collateral Order. This relief will enable the Debtor to operate its business in the ordinary course and avoid immediate and irreparable harm and

{2338835:3}                                14

10-64360-rk    Doc 8    FILED 10/14/10    ENTERED 10/14/10 00:42:06    Page 14 of 16

prejudice to its estate and all parties in interest, including patients, the County, Dennison, and it surrounding communities, pending the Final Hearing.

### IV. Notice Procedures and Scheduling Final Hearing

39. Notice of the Interim Hearing, this Motion and proposed entry of the Interim Cash Collateral Order has been provided by the Debtor to the following parties: (a) the Office of the United States Trustee for the Northern District of Ohio; (b) those creditors listed on the Debtor's List of Creditors Holding the 20 Largest Unsecured Claims; (c) Wells Fargo Bank, National Association, Master Trustee; (d) The Commercial & Savings Bank; and (e) the District Director of Internal Revenue (collectively, the "Initial Notice Parties"). The Debtor submits that, under the circumstances, no further notice of the hearing on the interim use of Cash Collateral is necessary and requests that any further notice be dispensed with and waived.

40. The Debtor respectfully requests that the Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Cash Collateral Order which fixes the time and date for the filing of objections by first-class mail upon: (a) the Initial Notice Parties; (b) counsel to any statutory committees appointed in this chapter 11 case; and (c) any party who filed a request for notices in this chapter 11 case pursuant to Bankruptcy Rule 2002 prior to the date set forth in the Interim Cash Collateral Order for service of notice of the Final Hearing. The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

### V. Waiver of Requirement to File Memorandum of Law

41. The Debtor submits that this Motion does not present any novel issues of law requiring briefing. Therefore, the Debtor requests that the Court waive the requirement pursuant to Local Rule 9013-1(a) for a memorandum in support of this Motion.

### VI. No Prior Request

42. No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court: (i) enter an order, substantially in the form attached hereto as Exhibit A, granting the relief sought herein; (ii) after a Final Hearing, enter a final order authorizing the use of Cash Collateral in the ordinary course of the Debtor's business; and (iii) grant such other and further relief as the Court may deem proper.

October 13, 2010                                    Respectfully submitted,

/s/ Shawn M. Riley
Shawn M. Riley (0037235)
Paul W. Linehan (0070116)
McDONALD HOPKINS LLC
600 Superior Avenue, East
Suite 2100
Cleveland, OH 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
E-mail: sriley@mcdonaldhopkins.com
        plinehan@mcdonaldhopkins.com

PROPOSED COUNSEL FOR THE DEBTOR
AND DEBTOR IN POSSESSION